Benjamin Heikali (SBN 307466)
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-mail: bheikali@faruqilaw.com

[Additional Captions on Signature Page]

*Attorney for Plaintiff Robert Stein*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT STEIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SIGMA DESIGNS, INC., J. MICHAEL DODSON, MARTIN MANNICHE, SALEEL AWSARE, and ELIAS NADER,<br><br>Defendants. | Case No.: 3:18-cv-1879<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(A) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Robert Stein ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Sigma Designs, Inc. ("Sigma" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Sigma, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the asset sale of a portion of its business ("Asset Sale") to Silicon Laboratories Inc. ("Silicon Labs").

2. On December 7, 2017, the Board caused the Company to enter into an Agreement and Plan of Merger (the "Agreement") pursuant to which Company shareholders would have received $7.05 in cash per share of Company common stock, a deal valued at $282 million (the "Merger Consideration"). Under the Agreement's terms, consummation of the Merger was subject to the satisfaction of certain conditions by Sigma, including the sale or shut down of Sigma's television and set-top box business and the amendment or termination of certain contracts pursuant to the Agreement, the failure of which allowed the parties to convert from a merger transaction to an asset sale of "all of the assets which relate to our Z-Wave business, including all of our equity interest in certain subsidiaries engaged in the Z-Wave business, and the assumption by Silicon Labs of all of our liabilities related to our Z-Wave business, for $240 million in cash" (the "Asset Sale").

3. On January 23, 2018, it was reported that Sigma could not meet the conditions to the merger and the parties proceeded with the asset sale. According to the terms, Sigma shareholders stand to receive between $5.82 and $6.58 per share via two separate distributions from the proceeds of the Asset Sale (the "Consideration"), representing a ***potential reduction from***

2
CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934

*the Merger Consideration of 17% and 7%, respectively*. As contemplated in the Agreement, the Asset Sale must be approved by Sigma shareholders.

4. On March 19, 2018, in order to convince Sigma shareholders to vote in favor of the Asset Sale, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement on a Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading Proxy independently violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

5. On, March 22, 2018, the Company filed a Form 8-K with the SEC, which disclosed that Thinh Q. Tran, the Company's founder and, up until January 19, 2018, the President, CEO, and Director, had founded a new company that would purchase the Company's Smart TV and set-top box business (the "Multimedia Business") for approximately $4.7 million in cash. Tellingly, this was the portion of Sigma's business that needed to be sold in order to allow shareholders to receive the full Merger Consideration.

6. While touting the fairness of the Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Asset Sale, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

7. In particular, the Proxy contains materially incomplete and misleading information concerning the financial projections for the Company that were prepared by the Company and relied upon by the Board in recommending the Company's shareholders vote in favor of the Asset Sale. The financial projections were also utilized by Sigma's financial advisor, Deutsche Bank Securities Inc. ("Deutsche Bank"), in conducting the valuation analyses in support of its fairness opinion that the consideration to be received by Sigma via the Asset Sale was fair from a financial point of view to the Company. Proxy 3.

8. It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming shareholder vote in order to allow the Company's shareholders to make an informed decision regarding the Asset Sale.

9. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Asset Sale and taking any steps to consummate the Asset Sale unless, and until, the material information discussed below is disclosed to Sigma shareholders sufficiently in advance of the vote on the Asset Sale or, in the event the Asset Sale is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

11. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Sigma is incorporated in this District.

## PARTIES

13. Plaintiff is, and at all relevant times has been, a holder of Sigma common stock.

14. Defendant Sigma is incorporated in California and maintains its principal executive offices at 47467 Fremont Blvd., Fremont, California 94538. The Company's common stock trades on the Nasdaq Stock Market under the ticker symbol "SIGM."

4
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

15. Individual Defendant J. Michael Dodson has served as a director of the Company since July 2013.

16. Individual Defendant Martin Manniche has served as a director of the Company since February 2014.

17. Individual Defendant Saleel Awsare has served as a director of the Company since February 2018.

18. Individual Defendant Elias Nader has served as a director of the Company since February 2018.

19. The Individual Defendants referred to in paragraphs 15-18 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Sigma (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

21. This action is properly maintainable as a class action because:

   a. The Class is so numerous that joinder of all members is impracticable. As of February 26, 2018, there were approximately 39,499,507 shares of Sigma common stock outstanding. The actual number of public shareholders of Sigma will be ascertained through discovery;

   b. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

      i) whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

5
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934**

  ii) whether Defendants have misrepresented or omitted material information concerning the Asset Sale in the Proxy in violation of Section 14(a) of the Exchange Act;

  iii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

  iv) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Asset Sale based on the materially incomplete and misleading Proxy.

 c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

 d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

 e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

 f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

 g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I. The Asset Sale**

22. Sigma is a provider of global integrated semiconductor solutions. The Company offers media platforms for use in the home entertainment and home control markets. Sigma sells

6

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

its products into markets, including smart television, media connectivity, set-top box and Internet of Things devices. Set-top box products consist of connected media processors and players delivering internet protocol streaming video, including hybrid versions of these products.

23. On December 7, 2017, Sigma and Silicon Labs issued a joint press release announcing the Agreement, which states in pertinent part:

> AUSTIN, Texas and FREMONT, Calif. – Dec. 7, 2017 – Silicon Labs (NASDAQ: SLAB) and Sigma Designs, Inc. (NASDAQ: SIGM) today announced a definitive agreement under which Silicon Labs will acquire Sigma Designs for $7.05 per share in a cash transaction valued at approximately $282 million, subject to certain closing conditions. This price represents a 26 percent premium over Sigma Designs' closing price of $5.60 per share on Dec. 6, 2017.
>
> Sigma Designs provides solutions for the connected home including Z-Wave, a leading Internet of Things (IoT) technology for smart home solutions. Z-Wave supplies some of the world's largest ecosystems of smart home IoT products with more than 2,100 certified, interoperable devices available from more than 600 manufacturers. The addition of Z-Wave will expand Silicon Labs' wireless connectivity portfolio and worldwide customer base for the connected home.
>
> "The connected home represents one of the largest market opportunities in the IoT. Today, there is no single dominant wireless technology for home automation and protocols include Wi-Fi, Bluetooth®, Zigbee®, Thread and proprietary," said Tyson Tuttle, CEO of Silicon Labs. "By adding Z-Wave technology to Silicon Labs' connectivity portfolio, we will be better positioned to serve this fast-growing market. Ecosystem providers and developers will have a one-stop-shop for wireless connectivity solutions for the home."
>
> The addition of Z-Wave extends connectivity options for developers and ecosystem providers and delivers alternatives to customers and markets for secure, interoperable IoT devices. Silicon Labs intends to work in collaboration with the Z-Wave Alliance to drive adoption and development of Z-Wave technology.
>
> "This is an exciting day for Sigma Designs, and we are pleased to be joining forces with Silicon Labs," said Thinh Q. Tran, President and CEO of Sigma Designs, Inc. "Silicon Labs and Z-Wave share a vision of secure, interoperable smart homes. This transaction provides immediate value to our shareholders, and offers new growth opportunities for our employees and customers to develop a wider range of leading-edge solutions."
>
> In addition to Z-Wave technology, Sigma Designs also provides solutions for Media Connectivity and Smart TV. Sigma Designs plans to divest or wind down its Smart TV business.
>
> In addition, Sigma Designs is in active discussions with prospective buyers to divest its Media Connectivity business. Subsequent to

> divestiture and restructuring actions, Silicon Labs expects the acquisition of Sigma Designs to be accretive on a non-GAAP basis.
>
> In the event that certain closing conditions are not met, the parties have agreed that Sigma Designs would instead sell its Z-Wave business to Silicon Labs for $240 million, contingent upon approval by Sigma Designs' stockholders.

24. The Merger Consideration appears inadequate in light of the Company's recent restructuring efforts. The Company has been engaged in a significant restructuring process since October 2017 intended to "refocus its operating expenses and accelerate the return to profitability." Sigma, Press Release (Form 8-K) (Oct. 11, 2017). This includes streamlining the Company's Connected Smart TV Platforms business to lower operating expenses.

25. As is common when restructuring a business, the plan has impacted the Company's recent short-term financial performance in order to set the Company on a trajectory for future long-term growth. For instance, the Company's last quarter of 2017 was significantly impacted by certain non-reoccurring charges, several of which were one-time charges for severance and lease termination. Nevertheless, the Company has experienced double-digit Gross Profit Margin growth in 2017. In other words, the Company's restructuring plan, while costly in the short-term, is likely to result in future benefits to the Company and its shareholders.

26. In sum, it appears that Sigma is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Asset Sale.

**II.     The Materially Incomplete and Misleading Proxy**

27. On February 23, 2018, Defendants caused the Proxy to be filed with the SEC in connection with the Asset Sale. The Proxy solicits the Company's shareholders to vote on April 17, 2018 in favor of the Asset Sale. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it

did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits both required and material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Asset Sale, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Financial Projections that Violate Regulation G and SEC Rule 14a-9*

28. The Proxy discloses certain financial projections for the Company on pages 70-72. However, the Proxy fails to provide material information concerning the projections—the August 2017 WholeCo Projections, December 2017 Projections - WholeCo Projections, December 2017 Projections - IoT Business Projections, and January 2018 Projections—which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Asset Sale. Proxy 70-72.

29. Specifically, the Proxy provides values for "Op Inc (Loss) after Corp Alloc" under both the August 2017 WholeCo Projections and December 2017 Projections - WholeCo Projections. Proxy 71. The Company states that it is a non-GAAP measure which excludes "stock-based compensation, amortization of acquired intangibles, impairment and restructuring costs." Proxy 70. However, the Proxy fails to disclose what financial metric those line items are being excluded from (i.e. the starting point for its calculation), the values of the excluded line items, nor a reconciliation of Op Inc (Loss) after Corp Alloc to its GAAP equivalent.

30. The Proxy also discloses projected EBITDA in both its December 2017 Projections - IoT Business Projections and January 2018 Projections as a non-GAAP measure defined as "earnings before interest, taxes, depreciation and amortization, and excludes stock-based compensation, amortization of acquired intangibles, impairment and restructuring costs." Proxy 72. However, the Proxy does not provide the values for any of the line items mentioned, nor a reconciliation of EBITDA to its most comparable GAAP equivalent. Proxy 72.

31. The Company also provides the values for cash taxes as a cash flow item used in its calculation of Unlevered Free Cash Flow under both the December 2017 Projections - IoT Business Projections and January 2018 Projections, explaining via a footnote that it "takes into

9
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934**

account utilization of net operating losses." Proxy 72. However, the Proxy does not disclose the value of these net operating losses ("NOLs"), nor how they were calculated.

32. The omission of the above material financial projections utilized by the Sigma Board to review and approve the Proposed Transaction and recommend that Sigma shareholders vote to approve violates Section 14(a) of the Exchange Act.

33. When a company discloses non-GAAP financial measures in a proxy statement that was relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the Company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100 ("Regulation G").

34. Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Sigma included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully

oversee their company's use of non-GAAP measures and disclosures.[1] (emphasis added)

35. The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2] Indeed, the SEC's Division of Corporation Finance released a new and updated Compliance and Disclosure Interpretation ("C&DI") on the use of non-GAAP financial measures to clarify that Regulation G applies when a company and its board of directors utilizes and relies on non-GAAP financial projections to recommend and solicit votes in favor of a corporate transactions, such as this one.  Proxy 57.[3]

36. Thus, in order to bring the Proxy into compliance with Regulation G as well as cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 70-72, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

37. At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the aforementioned non-GAAP measures.  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading. Indeed, the Defendants acknowledge the misleading nature of non-GAAP projections as Sigma shareholders are cautioned in Annex E of the Proxy:

> Non-GAAP financial measures are not a substitute for financial information prepared in accordance with GAAP. Therefore, non-GAAP financial measures should not be considered in isolation, but should be considered together with the most directly comparable GAAP financial measures and the reconciliation of the non-GAAP financial measures to the most directly comparable GAAP financials

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3] *Non-GAAP Financial Measures*, U.S. Securities and Exchange Commission (Oct. 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm#101.

11

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

> measures. The Company presents non-GAAP financial measures to provide investors with an additional tool to evaluate its operating results in a manner that focuses on what management believes to be its core, ongoing business operations. Furthermore, non-GAAP financial measures used by the Company may not be the same non-GAAP financial measures as those utilized by other companies; specifically, non-GAAP financial measures used by the Company may be calculated differently than other companies. Investors should, therefore, exercise caution when comparing non-GAAP financial measures used by Sigma to similarly titled non-GAAP financial measures of other companies.

Proxy E-1.

### The Materially Misleading Financial Analyses

38. The financial projections at issue also were relied upon by the Company's financial advisor, Deutsche Bank, in connection with its valuation analyses and fairness opinion for the Asset Sale. Proxy 66. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once a proxy statement discloses internal projections relied upon by the Board, those projections must be complete and accurate.

39. With respect to Deutsche Bank's Discounted Cash Flow Analysis ("DCF") for the Company, the Proxy states that Deutsche Bank based its analysis on estimates of "after-tax unlevered free cash flows ["UFCF'] for the Z-Wave Business for the calendar years ended December 31, 2018 through December 31, 2022 that were provided by Sigma's management." Proxy 68. The Company later explains that Deutsche Bank calculated UFCF as (a) earnings before interest, taxes, depreciation and amortization, but excluding stock based compensation expenses and impairment and restructuring costs less, (b) stock based compensation expense, less (c) cash taxes, less (d) capital expenditures, less (e) change in working capital. *Id*. Despite disclosing that the UFCF projections were provided by the Company's management, the Proxy fails to disclose the actual projected values of UFCF nor the values of the line items mentioned to calculate UFCF. The Proxy also fails to disclose whether the UFCF was different from the UFCF projections calculated by the Company. The absence of this information renders Deutsche Bank's Discounted Cash Flow analysis incomplete and misleading.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

40. The definition of projected after-tax UFCF is, in and of itself, and separate and apart from the mandates of Regulation G, materially false and/or misleading in violation of SEC Rule 14a-9 (17 C.F.R. 240.14a-9). Because neither the method nor the line items used to calculate after-tax UFCF were not disclosed, shareholders are unable to discern the veracity of Deutsche Bank's discounted cash flow analyses. Without further disclosure, shareholders are unable to compare Deutsche Bank's calculations with the Company's financial projections. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

41. These key inputs are material to Sigma shareholders, and their omission renders the summary of Deutsche Bank's DCF analysis incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of their fairness opinions, in a discounted cash flow analysis a banker takes management's projections, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value… The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

42. Regarding Deutsche Bank's retention by the Company to provide a fairness opinion on both the Plan of Merger and the Asset Sale, the Proxy does not disclose whether Deutsche Bank had previously been retained by the Company, and if so, the nature and extent of the services rendered, and any compensation received in return. The omission of this information is material for the Company's shareholders, who would undoubtedly find significant the extent and nature of any past relationship between the Company and the financial advisor that provided a fairness to its Board in connection with the Asset Sale.

*Material Omissions with Regard to Nondisclosure Agreements Entered Into During the Strategic Process*

43. Moreover, the Proxy states that the Company entered into nondisclosure agreements ("NDAs") with several parties with whom Sigma was engaged in strategic discussions prior to its eventual agreement with Silicon Labs. With regard to the NDAs, the Proxy explained: "[u]nless otherwise specified below, each of the nondisclosure agreements which Sigma entered into from time to time as described below contained a similar standstill provision, including an automatic termination feature, and did not contain the 'don't ask, don't waive' provision." Proxy 30.

44. The Proxy then describes the NDA reached with Company D: "On May 17, 2016, Sigma executed a nondisclosure agreement with Company D in substantially the same form as described above." Proxy 33. The Proxy similarly explains the NDA reached with Company C: "On June 28, 2016 and in response to Silicon Labs' request to engage with Company C regarding a potential transaction with Sigma, Sigma and Company C executed a nondisclosure agreement substantially in the form described above in order to enable Silicon Labs to discuss with Company C a potential acquisition of Sigma." Proxy 34. Despite the descriptions of the NDAs reached with both Companies C and D, it is materially misleading for the Company to describe both NDAs as "substantially in the form described" without any further explanation. It is necessary that the Company provide additional information, if any, regarding material differences between the NDAs reached with Companies C and D and those reached with the other strategic parties.

45. Clearly, shareholders would find this information material since the Board's unanimous recommendation that shareholders vote in favor the Asset Sale was based, in part on the following:

- the determination that the Asset Sale is more favorable to Sigma's shareholders than any other strategic transaction reasonably available to the Company, which determination was made after conducting an extensive review of strategic alternatives . . .

- the Company Board's assessment, after discussions with management and the Company's advisors, of the risks of remaining an independent pure-play IoT company and pursuing its initiative to wind down the Smart TV and Set-top Box businesses and other

14
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

business objectives, including the risks (such risks are not intended to be exhaustive) relating to:
- the Company's recent and projected declining revenue;
- the Company's recent and projected losses;

Proxy 58.

46.  Compounding on the materiality of the omitted information is the fact that the Company's founder is purchasing the Multimedia Business, but due to the timing of that agreement, Sigma shareholders are still receiving consideration that will ultimately be a reduction from the Merger Consideration ranging from 7% to 17%.

47.  Clearly shareholders would want to fully understand the sale process, and whether any parties were prohibited from making a superior proposal, especially in light of the sale of the Multimedia Business, as well as understand the true value of the Company before voting on the Asset Sale.

48.  In sum, the Proxy independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial measure to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Asset Sale from Sigma shareholders.

49.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Asset Sale, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Asset Sale, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

50.  Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

51.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

52.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

53.     The failure to reconcile the numerous non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

54.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy communications that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

---

16

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

56. Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

57. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Asset Sale. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

58. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

59. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Asset Sale.

60. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

61. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or

failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Agreement and the preparation of the Company's financial projections.

62. Sigma is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

63. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Asset Sale.

64. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

65. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66. The Individual Defendants acted as controlling persons of Sigma within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Sigma, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

67. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Asset Sale. They were thus directly involved in preparing the Proxy.

69. In addition, as described herein and set forth at length in the Proxy, the Individual Defendants were involved in negotiating, reviewing, and approving the Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

70. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

71. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

72. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Asset Sale or consummating the Asset Sale, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C. Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 27, 2018

| OF COUNSEL: | Respectfully submitted, |
|---|---|
| **FARUQI & FARUQI, LLP**<br>Nadeem Faruqi<br>James M. Wilson, Jr.<br>685 Third Ave., 26th Fl.<br>New York, NY 10017<br>Tel.: (212) 983-9330<br>Email: nfaruqi@faruqilaw.com<br>Email: jwilson@faruqilaw.com<br><br>*Counsel for Plaintiff* | **FARUQI & FARUQI, LLP**<br><br>By: */s/ Benjamin Heikali*<br>Benjamin Heikali, Bar No. 307466<br>10866 Wilshire Blvd., Suite 1470<br>Los Angeles, CA 90024<br>Tel.: (424) 256-2884<br>Fax: (424) 256-2885<br>Email: bheikali@faruqilaw.com<br><br>*Counsel for Plaintiff* |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**